JEWETT, Admr., et al., Appellants,

v.

OUR LADY OF MERCY HOSPITAL OF MARIEMONT;

FROEHLICH et al., Appellees.

[Cite as *Jewett v. Our Lady of Mercy Hosp. of Mariemont* (1992), 82 Ohio App.3d 428.]

Court of Appeals of Ohio,
Hamilton County.

No. C–910028.

Decided Jan. 8, 1992.

*Lindhorst & Dreidame* and *Michael F. Lyon,* for appellants, Michael D. Jewett, Administrator, and Sharon Jewett.

*Jacobson, Maynard, Tuschman & Kalur* and *James P. Triona,* for appellees, Francis J. Froehlich, M.D., and Francis J. Froehlich, M.D., and C.J. Condorodis, M.D., Inc.

---

*Per Curiam.*

The plaintiffs-appellants appeal from the trial court's order granting a directed verdict in favor of the defendants-appellees in a wrongful-death action.

In the early morning hours on October 6, 1986, Sharon Jewett, then nine months' pregnant, telephoned her obstetrician, defendant-appellant Francis J.

Froehlich, M.D. ("Froehlich"), and informed him that her "water had broken." After a brief conversation, Froehlich instructed Jewett to visit his office at eleven o'clock that morning. At that time, Froehlich examined Jewett and determined that her membranes had indeed ruptured and that there was a slow leakage of fluid. He concluded, however, that Jewett was not "in labor." In any event, Jewett was admitted to .Our Lady of Mercy Hospital of Mariemont, where an external fetal monitor was placed around her stomach to record the fetus's heart rate. By two o'clock that afternoon, when Jewett still had not begun labor, Froehlich telephoned the hospital and instructed the nursing staff to administer Pitocin, a compound utilized to stimulate uterine contractions. At some unspecified time, Jewett began to experience contractions. At 4:37 p.m., the external monitor detected bradycardia, or a deceleration in the fetal heart rate. The attending nurse turned off the Pitocin drip, administered oxygen to Jewett and instructed Jewett to move onto her left side and then onto her right side. Within eight to ten minutes the fetal heart rate returned to an acceptable baseline range of one hundred thirty to one hundred forty beats per minute. At 4:48 p.m., a nurse called Froehlich and advised him of the brief episode of bradycardia. Froehlich's instructions at that time were to "keep an eye" on the patient and to call him if there were any further complications. Several minutes later, at 4:57 p.m., the fetus again experienced bradycardia, which continued after the nurse moved Jewett onto her side. At 5:02 p.m., a nurse telephoned Froehlich and informed him that the fetus was again experiencing difficulties. Froehlich indicated that he was "on his way" and instructed the nurse to prepare for an emergency Cesarean section. Froehlich arrived at the hospital at 5:15 p.m. and the child, Brandon, was delivered at 5:27 p.m. Brandon, at that time, was blue and flaccid, and was not breathing. At that point, Dr. Claybon, an anesthesiologist, and various nurses took steps to resuscitate the child. Initially, a nurse began "bag breathing" the child with a mask. After a short time, however, Claybon placed an endotracheal tube in the child's trachea in an attempt to aerate his lungs. Compressions on the child's chest were begun and various medications were administered through an intravenous tube placed in the child's hand. At 5:50 p.m., Dr. Levine, a neonatologist, arrived to assist with the resuscitation. At that time, the child was limp and blue, and had a very low heart rate. Dr. Levine quickly examined Brandon and opined that he was not being properly ventilated and that the endotracheal tube had, in fact, been placed in his esophagus. After Levine repositioned the tube, the child's color apparently improved and there was an increase in his heart rate.

Over the next several months, Brandon experienced difficulties, including infection and an inability to swallow. On May 26, 1987, he died.

The plaintiffs initiated the instant wrongful-death action against several defendants, alleging, *inter alia,* that Froehlich failed to properly monitor Jewett prior to the birth of Brandon. At some unspecified time, the plaintiffs dismissed their claims against Our Lady of Mercy Hospital of Mariemont and the matter proceeded to trial. The defendants' motion for a directed verdict at the conclusion of the plaintiffs' case was overruled by the trial court. Later, however, at the conclusion of all the evidence, the trial court granted the defendants' renewed motion for a directed verdict. The plaintiffs now appeal.

In their single assignment of error, the plaintiffs allege that the trial court erred in granting a directed verdict in favor of the defendants. In support of this assignment, the plaintiffs argue that the evidence adduced at trial, particularly the testimony of their medical expert, Dr. Garth Essig ("Essig"), was of sufficient probative value to raise an evidentiary controversy concerning whether Froehlich was negligent and whether his negligence was the proximate cause of Brandon's death. Moreover, the plaintiffs maintain that the trial court, in directing the verdict in favor of the defendants, improperly weighed the evidence and tried the credibility of the witnesses.

The defendants, on the other hand, contend that a directed verdict in the instant case was proper because the plaintiffs failed to present evidence of a prima facie medical malpractice case against Froehlich.

After reviewing the transcript of the proceedings in the instant case, we are constrained to agree with the plaintiffs that the trial court improperly assessed the credibility of the witnesses prior to directing a verdict in favor of the defendants. However, recognizing that "a reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as the basis thereof," *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172, 174, we will undertake the task of determining whether the evidence presented by the plaintiffs raised triable questions of fact concerning whether Froehlich was negligent in caring for Jewett prior to delivery of Brandon and whether his negligence was the proximate cause of the plaintiffs' damages.

In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing that a physician of ordinary skill, care, and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing that such a physician would have done under like or similar conditions or circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do such particular thing. *Bruni v. Tatsumi* (1976), 46 Ohio

St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus. The standard of care for a physician in the practice of a board-certified medical specialty should be that of a reasonable specialist practicing medicine in that same specialty in light of the scientific knowledge in that specialty field. *Bruni v. Tatsumi, supra*, paragraph two of the syllabus. Proof of the recognized standards must necessarily be provided through expert testimony. Thus, in reviewing the proceedings below, our analysis will focus upon whether the plaintiffs demonstrated by affirmative evidence that Froehlich was unskillful or negligent in caring for Jewett and whether that conduct injured the plaintiffs. If either element is lacking in proof, the plaintiffs have failed to present a case for the consideration of the jury.

■ In the instant case, the defendants maintain that the trial court properly granted their motion for a directed verdict because the plaintiffs failed to produce evidence at trial that Froehlich, in treating Jewett, departed from those standards of care promulgated by the American College of Obstetricians and Gynecologists ("ACOG").

During the presentation of their case below, the plaintiffs called Dr. Essig, a board-certified obstetrician, who testified that Froehlich should have responded to the hospital subsequent to the administering of the Pitocin to periodically monitor Jewett's condition; that Froehlich should have performed the Cesarean section when bradycardia was first detected by the fetal monitor; that an intrauterine catheter should have been utilized by Froehlich to monitor the situation; that Froehlich departed from acceptable standards of care in his treatment of Jewett; and that Froehlich's departure from the proper standards of care was the proximate cause of Brandon's death. Essig did concede during cross-examination that the standards announced by ACOG are the minimal accepted standards for his specialty. This observation was supported by the testimony of Dr. Levine and Dr. O'Grady, expert medical witnesses called on behalf of the defendants. Moreover, while Essig did admit that the ACOG standards did not require the use of an intrauterine catheter in all cases and, further, that the Cesarean section was performed within the acceptable period of time (thirty minutes) set forth under the ACOG standards, he was adamant that the decision to perform the Cesarean section should have been made at or near the time that bradycardia was first detected by the fetal monitor and that Froehlich's delay in making that decision was a departure from acceptable standards of care. Although Levine and O'Grady disagreed with Essig's assessment of Froehlich's performance, we are convinced that the plaintiffs did, in fact, adduce evidence at trial that Froehlich departed from the acceptable standards of care in treating Jewett.

In challenging Essig's testimony regarding the proximate cause of Brandon's death, the defendants claim that his opinion was violative of Evid.R. 703 and therefore should have been stricken from the record at trial because it was based upon the impression of a neonatologist that was recorded in the Children's Hospital medical records.

Evid.R. 703 provides that:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

"Data" is defined as "[o]rganized information generally used as the basis for an adjudication or decision" or "organized information, collected for specific purpose." Black's Law Dictionary (5 Ed.Rev.1979) 356.

In the instant case, after reviewing the record, we are convinced that the neonatologist's impression that Brandon suffered from "severe birth asphyxia" was a "learned statement of an observable condition falling under the definition of 'data' or organized information." See *Blakeman v. Condorodis* (1991), 75 Ohio App.3d 393, 599 N.E.2d 776. Moreover, the hospital records containing the statement at issue were admitted into evidence at trial. We conclude, therefore, that Essig's testimony was not violative of Evid.R. 703. Likewise, contrary to the assertions of the defendants, we are not persuaded that Essig's testimony regarding the proximate cause of Brandon's injuries was speculative or devoid of foundation. Essig testified that he had reviewed various depositions, hospital records and fetal-monitor tracings and that based upon those sources, as well as his knowledge, training and experience as a physician, he was able to conclude that there was a proximate causal relationship between Brandon's asphyxia, brain damage and subsequent death and Froehlich's departure from the proper standards of care in treating Jewett. We conclude, therefore, that the trial court did not abuse its discretion when it overruled the defendants' motion to strike Essig's testimony. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 543 N.E.2d 1233.

Accordingly, after construing the foregoing evidence most strongly in favor of the plaintiffs, we hold that reasonable minds could not come to but one conclusion upon the evidence submitted and that the jury below should have been permitted to pass on the questions of whether Froehlich acted negligently and whether that negligence was the proximate cause of Brandon's death. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467.

The judgment of the trial court is reversed and the cause is remanded for further proceeding in accordance with law.

*Judgment reversed*
*and cause remanded.*

GORMAN, P.J., SHANNON and HILDEBRANDT, JJ., concur.