[Cite as *State v. Dixon*, 2010-Ohio-5032.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 09CA3312 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| William Dixon, | : | |
| Defendant-Appellant. | : | **Released 09/22/10** |

_____

APPEARANCES:

Gene Meadows, Portsmouth, Ohio, for appellant.

Mark E. Kuhn, Scioto County Prosecutor, Pat Apel, Scioto County Assistant Prosecutor, and Danielle M. Parker, Scioto County Assistant Prosecutor, Portsmouth, Ohio, for appellee.

_____

Harsha, J.

{¶1}  A jury convicted William Dixon of aggravated robbery, felonious assault, and attempted murder as the result of a violent robbery at a grocery store.  The State introduced evidence that Dixon, along with his co-defendant Wayne Murphy, viciously assaulted a clerk in the grocery store with a hammer and then stole the clerk's wallet and the cash register.  After the jury's verdict, the trial judge sentenced Dixon to a total of twenty-eight years in prison.

{¶2}  Initially, Dixon argues that the court erred by admitting evidence of his conviction for a similar robbery that occurred in Kentucky.  However, evidence of the Kentucky robbery was admissible for purposes of proving a material element of the State's case, i.e., Dixon's identity.  And although evidence of a rape that occurred during the robbery was not admissible under Evid.R.404(B) and should have been

excluded under Evid.R. 403(A), we conclude that the trial court's error in admitting it was harmless because of the substantial evidence of Dixon's guilt.

{¶3}    Next, Dixon contends that the trial court erred in its pretrial ruling that certain testimony was admissible under the "excited utterance" exception to the general prohibition on hearsay.  We need not address the merits of this argument because the contested testimony was never introduced at trial.

{¶4}    Finally, Dixon argues that the trial court erred by sentencing him consecutively for allied offenses of similar import.  We conclude that aggravated robbery is not an allied offense of either felonious assault or attempted murder.  But we agree with Dixon that felonious assault and attempted murder are allied offenses and that the evidence at best supports a single animus for both offenses.  Therefore we remand for resentencing on these two crimes.

## I. Summary of Facts

{¶5}    In July 2004, Art Waddell was working the cash register at a grocery store in Franklin Furnace, Ohio.  When he saw two males in the rear of the store at the meat counter, he locked the cash register and went to help them.  As he approached the meat counter he was struck in the back of the head with a hammer and rendered unconscious.  He suffered serious injuries to the head, including a depressed skull fracture.  The robbers made away with Waddell's wallet and the cash register, both of which contained cash.

{¶6}    After being arrested for a similar robbery in Kentucky, Murphy and Dixon were indicted for the Ohio crime, where they were charged in separate indictments with aggravated robbery, felonious assault, attempted murder, and conspiracy to commit

aggravated robbery. Prior to the trial the court granted the State's motion to consolidate their trials. The court later held a hearing on several pending defense motions, including a motion to exclude evidence of the Kentucky crime and a motion for separate trials. The court found that evidence concerning the Kentucky robbery was admissible for purposes of demonstrating identity and denied the motions for separate trials.

{¶7} The court also held a security hearing to determine whether Dixon and Murphy would be placed in restraints for trial. Based on the violent nature of the crimes, the fact that both defendants were incarcerated in Kentucky on similar charges, and that jurors would know this because of the admission of "other acts" evidence, the court ordered that both defendants be placed in restraints for trial.

A. The Trial

1. Evidence of the Ohio Robbery

{¶8} Art Waddell testified that he was working alone at the Blanton and Graff Grocery (B+G) in Franklin Furnace, Ohio around noon on July 5, 2004. Waddell began his shift early because the employee on duty became ill and required hospitalization. An ambulance picked up the sick employee and Waddell worked checking out shoppers at the cash register.

{¶9} Shortly before the incident, Greg Russell was inside B+G playing lottery tickets. He observed two men in the back of the store near the meat counter. One man with long hair was staring at him. Russell later identified this man as Murphy after seeing a picture of him on television.

{¶10} Danny Clement testified that he arrived at B+G as the ambulance was leaving with the sick employee. Clement noticed two men standing in the back of the

store. He could not see their faces but he remembered one had long hair and the other had short hair. As he left the store he saw a woman he recognized standing next to a car in the parking lot. This was Tracy Chaffins, Murphy's girlfriend.

{¶11} Waddell testified that as he was checking out customers he observed Murphy and Dixon in the back of the store in front of the meat counter. He recognized Dixon from being in the store previously and vaguely recognized Murphy, maybe having seen him once before. Waddell checked out the last customer in the store and saw that both men were still standing at the meat counter. He locked the cash register and then walked up a store aisle towards the meat counter to assist the two men.

{¶12} Before he arrived at the meat counter Waddell observed that Dixon was standing alone and he could not see Murphy. However, he believed Murphy had not left the store because there was only one exit and it was near the cash register. Waddell believed that Murphy was either hiding or stealing. Waddell was about ten to twelve feet away from Dixon when he lost all memory and woke up in the hospital.

{¶13} An unknown individual walked up to the local fire station and reported that Waddell had been injured at B+G. When the ambulance crew arrived they found Waddell perched on a stool bleeding profusely from the head. At the hospital, medical staff determined that Waddell received multiple blows to the head including puncture wounds that left bits of his brain in his hair. Waddell testified that he ultimately received five blows to the head and twelve blows to his arms.

{¶14} Jodi Conkel of the Scioto County Sheriff's Office conducted the investigation of the B+G robbery. At the crime scene she observed blood on the floor, blood splatter, and bloody drag marks leading from the back of the store to the front,

where the cash register, now missing, had been located. She explained some of the photographs of the crime scene to the jury. She located evidence of blood splatter, which indicated that an object was used to strike the victim.

{¶15} At the hospital Detective Conkel attempted to interview Waddell who initially could only communicate through vague written notes. In some of these notes he repeatedly wrote "$1,000". Waddell later testified that his wallet was missing after the robbery. He said it contained $1,000, money he was planning on taking to the bank after work.

{¶16} Detective Tim Wilson, a Kentucky police officer, contacted Detective Conkel about a week and a half later. He told her about a robbery at a video store in Russell, Kentucky -- about fifteen miles from the B+G crime. When Detective Wilson described the crime scene in Kentucky, Detective Conkel was struck by the similarities and went to view it. After viewing the crime scene Detective Conkel believed the crimes were perpetrated by the same person or persons.

{¶17} Dixon was arrested by Kentucky police. When Detective Conkel later interviewed Dixon about the B+G robbery, he made a statement concerning the crime. Detective Conkel read a redacted summary of this statement at trial. Apparently, the original statement implicated both Dixon and Murphy in the B+G robbery, but the redacted version replaced all references to Murphy with the word "he."

{¶18} Dixon also told Detective Conkel that hammers were used in both robberies and that she could find them at Murphy's residence. Police went to Murphy's residence and retrieved three hammers, which they sent to a crime lab in Kentucky. However, the test results were inconclusive for trace evidence.

2.  Evidence of the Kentucky Robbery

{¶19}  Melissa Ruffing testified that she was the sole employee working at the video store on July 14, 2004.  Murphy entered the store when there were no other customers inside, walked the entire length of the store and "cased it," apparently looking for security cameras.  He then went into an employee's-only storage room.

{¶20}  Ruffing was afraid to confront Murphy while she was alone in the store.  But when two women entered the store, she went to the storage room and told Murphy he could not be in there.  He cursed her and brushed past her, going back out to the video aisles.  He finished walking around the store, looked up to the ceiling, and then left.

{¶21}  Shortly afterwards Dixon walked in ostensibly to rent a video.  Dixon did not have a membership with the store and Ruffing helped him apply for one.  He gave her his identification card and she helped him fill out a membership form.  Ruffing informed him that the store had a special deal and he was entitled to rent a second video for free.  Dixon told her that he would go ask his friend to help him pick out the second video.  Ruffing told Dixon that she would be cleaning in one of the video aisles and pointed out where she would be when he was ready to check out the second video.

{¶22}  As Ruffing was down on her hands and knees cleaning shelves, she heard two people whispering.  She looked underneath her arm and saw a pair of boots.  She was then hit in the head with a hammer.  Murphy grabbed her, turned her over, grabbed one foot, and ordered Dixon to hold the other.  The two men dragged her back to the video store office where Murphy ordered Dixon to get the cash register.  Dixon left the office.  When Murphy demanded that Ruffing open the safe, she told him there was

no money in it.  Murphy began to hit her with his fists, knocking her down repeatedly.

Ruffing was wearing a ring and Murphy commented that "Tracy" would like it.  Ruffing

removed the ring, threw it down and ran out of the office into the middle of the store.

There she observed a woman standing outside, near the door.  But when Ruffing

screamed for help, the woman turned away.  Ruffing later identified the woman as Tracy

Chaffins.

**{¶23}**  Before she could escape, she was dragged back to the office.  Murphy

then raped her inside the office.  After the rape Murphy hit her in the head with a

hammer and knocked her unconscious.

### 3.  Murphy's and Dixon's Defenses

**{¶24}**  Dixon took the stand and testified that Murphy asked him for a ride to

Franklin Furnace.  He gave Murphy a ride and Murphy later told him they were going to

B+G.  He claimed he did not know that Murphy intended to rob the store.

**{¶25}**  While at B+G Dixon played lottery tickets.  He would walk outside to his

car to play them, and then reenter the store to purchase more lottery tickets. He denied

any involvement in the actual robbery or assault.   He also denied being in the store

when the robbery took place, and stated that he must have been sitting in his car when

it happened.  Dixon admitted seeing blood on Murphy, from his neck, on the front of his

white shirt, and down to his pants and a bloody hammer in his waistband.

**{¶26}**  Dixon also admitted taking some hammers from Murphy's mother's house

and hiding them outside the residence because he was "paranoid" that Murphy would

use them again.  On cross-examination, Dixon could not recall making many of the

statements that appeared in the redacted summary.

{¶27} Murphy did not take the stand. For his defense he called James, Terry, and Samantha Chaffins, the father, mother, and sister-in-law, respectively, of Tracy Chaffins.[1] Their testimony was that Tracy and Wayne arrived at James' and Terry's residence the night before the B+G robbery and spent the night. James stated that the family had a police scanner in the bedroom and the family was drinking coffee together on the morning of the B+G robbery. The group heard a report come on the scanner about James' sister- in-law, who happened to be the employee who fell ill at B+G.

{¶28} At some point, Dixon arrived in his car and wanted Murphy to leave with him. Because Tracy did not want Murphy to leave, they remained with the family. Later, all three testified that they heard another report on the police scanner that a man was beaten at B+G and required assistance. This assertion was challenged by the prosecutor, who asked them why a report would come on when earlier testimony suggested an unknown individual reported the assault directly at the fire station.

{¶29} Except for a brief moment in James Chaffins' testimony, all three witnesses remained consistent in their testimony that Murphy and Tracy did not go to Franklin Furnace. At one point James Chaffin stated that "Wayne, her, and Ryan left." But the remainder of his testimony was consistent with the other two alibi witnesses.

{¶30} The jury ultimately found Murphy and Dixon guilty of aggravated robbery, felonious assault, and attempted murder. Dixon was sentenced to ten years for aggravated robbery, eight years for felonious assault, and ten years for attempted murder. After the court ordered the sentences to be served consecutively for a total sentence of twenty-eight years, Dixon filed this appeal.

---

[1] The record reflects that Tracey Chaffins committed suicide sometime after the B+G and Kentucky robberies. Apparently she was indicted for her participation in the Kentucky robbery but was never tried.

## II. Assignments of Error

**{¶31}** Dixon presents three assignments of error:

1. The Trial Court erred to the prejudice of the Defendant's substantial rights by admitting unduly prejudicial testimony about other acts, the only probative value of which was to establish the Defendant's bad character and conduct in conformity therewith. The admission of this testimony was an abuse of discretion and violated the Defendant-Appellant, William Dixon's right to due process under the Fourteenth Amendment.

2. The Trial Court erred when ruling on the suppression motion by failing to exclude a statement made by Tracey Chaffin when the Trial Court ruled the statement made by Tracey Chaffin was an excited utterance, thus violating the Defendant-Appellant, William Dixon's right to confront the witness against him.

3. The Trial Court erred to the prejudice of the Defendant-Appellant and in violation of ORC 2941.25 when the Trial Court sentenced the Defendant-Appellant to consecutive sentences.

## III. Other Acts Evidence

**{¶32}** In his first assignment of error, Dixon contends that the trial court abused its discretion when it admitted evidence of the Kentucky robbery. Dixon contends that this evidence was offered only to prove his bad character and propensity to commit the B+G robbery. Dixon argues that the evidence did not prove any element of the B+G crime, did not relate to any material issue in that crime, and was too remote in time from the B+G crime. Finally, Dixon contends that the prejudicial effect of the evidence of the Kentucky robbery, specifically, the gruesome details of the rape and the photographs of the crime scene, outweighed whatever probative value it may possess. In response, the State argues that evidence of the Kentucky robbery was properly admitted under Evid.R.404(B) because there were a total of fourteen similarities between the crimes and thus it helped proved Dixon's identity in the B+G robbery.

**{¶33}** The admission of evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, at paragraph two of the syllabus. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24; *Wilmington Steel Products, Inc. v. Cleveland Elec. Illuminating Co.* (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, citing *Berk v. Matthews* (199), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301.

**{¶34}** Evidence of other acts is not admissible for the purpose of proving the accused acted in conformity with that character on a particular occasion. *State v. Treesh*, 90 Ohio St.3d 460, 482, 2001-Ohio-4, 739 N.E.2d 749; Evid.R. 404. However, Evid.R. 404(B) provides other acts evidence may be admissible when it is offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶35}** Additionally, R.C. 2945.59 provides that:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶36} R.C. 2945.59 is to be strictly construed against the State, and to be conservatively applied by a trial court. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 194, 509 N.E.2d 1256.

{¶37} Thus, evidence of other acts may be admissible if the evidence is offered for a purpose other than to show the accused's propensity to act in conformity with the accused's character, e.g., to commit a certain type of crime. *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, at the syllabus. For other acts evidence to be admissible, the evidence must be relevant to proving the guilt of the offense in question. *State v. Gardner* (1979), 59 Ohio St.2d 14, 20, 391 N.E.2d 337. See, also, *State v. Henderson* (1991), 76 Ohio App.3d 290, 294, 601 N.E.2d 596. There must be substantial evidence that the accused committed the act. *State v. Carter* (1971), 26 Ohio St.2d 79, 269 N.E.2d 115, at paragraph two of the syllabus. In addition, the prior act must not be too remote and must be closely related in time and nature to the offense charged. *State v. Burson* (1974), 38 Ohio St.2d 157, 159, 311 N.E.2d 526. If the act is too distant in time or too removed in method or type, it has no probative value. *Henderson* at 294.

{¶38} Here, the other acts evidence established a significant number of similarities between the B+G robbery and the Kentucky robbery. Among other similarities, evidence was introduced that (1) two men were involved in both robberies; (2) one person "cased" the place of business prior to the robbery; (3) a hammer or hammers were used to assault the victim; (4) the victim was attacked from behind; (5) the robberies took place at or around the noon hour; (6) the perpetrators dragged the victim from the initial point of attack to another part of the store where the money was

located, leaving a trail of blood; (7) a personal item was taken from the victim in both robberies; and (8) Tracy Chaffins was seen at both robberies.

{¶39} Contrary to Dixon's argument, this evidence was clearly offered to prove a material element of the State's case, i.e., Dixon's identification. Although Waddell identified Dixon as being in the store prior to the attack and robbery, he was unable to recall anything after the attack began. Dixon disputed that he was involved in the attack at all and claimed he was outside in his car when it occurred. Given the similarity of the two crimes, Dixon's participation in the Kentucky robbery helped establish that Dixon was a participant in the B+G robbery. Additionally, given the nine days separating the two crimes, there is no question that the Kentucky crime is "closely related in time." See, e.g., *State v. Chapman* (1959), 111 Ohio App. 441, 168 N.E.2d 14 (evidence of other act committed eight years prior to the time of crime charged inadmissible as being too remote in time); *Young v. State* (1932), 44 Ohio App. 1, 184 N.E. 24 (evidence of other act committed three years prior admitted to show scheme and intent).

{¶40} Dixon also contends that the State should not have been allowed to introduce the details of the rape that occurred during the course of the Kentucky incident. At the onset, we note that Ruffing did not describe the "gruesome" details of the rape as Dixon contends. Those were discussed at length at a pre-trial hearing. But, the State was allowed to ask Ruffing if she was raped, a fact that she confirmed. We agree with Dixon that evidence concerning the rape was not probative of his identity under Evid.R. 404(B). No sexual assault was alleged to have occurred in the B+G robbery and thus the evidence did not prove identity.

**{¶41}** We further agree that admission of evidence concerning the rape was also inadmissible under Evid.R. 403(A). As with all evidence, other acts evidence is subject to the relevancy and fairness requirements of Evid.R. 403(A) and must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Soke* (1995), 105 Ohio App.3d 226, 249, 663 N.E.2d 986; *State v. Matthews* (1984), 14 Ohio App.3d 440, 442, 561-562, 471 N.E.2d 849. Because its probative value was substantially outweighed by the danger of unfair prejudice, the trial court erred by admitting evidence of the rape. Nonetheless, we perceive this error as harmless.

**{¶42}** Dixon objected to the admission of the evidence concerning the rape at trial, thus harmless-error analysis is appropriate here. See *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, at ¶62. We apply non-constitutional harmless-error analysis to evidentiary errors such as this. *State v. Elliott* (Feb. 27, 1995), Highland App. No. 94CA836, 1995 WL 89732, at *3 (applying non-constitutional harmless-error analysis to admission of irrelevant evidence). See, also, *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶88 (applying non-constitutional harmless-error analysis to erroneous admission of other acts evidence); *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶74 (same). A non-constitutional error is harmless when there is substantial other evidence to support the guilty verdict. *State v. Webb*, 70 Ohio St.3d 325, 335, 1994-Ohio-425, 638 N.E.2d 1023. For the following reasons, we conclude that the erroneous admission of Ruffing's testimony concerning the rape was harmless.

**{¶43}** First, the State presented a substantial amount of other admissible evidence of Dixon's guilt, including a summary of his own inculpatory statement.

Second, the jurors were already properly exposed to graphic evidence of other repulsive conduct. Given the sadistic nature of the crimes for which Dixon was being tried, we seriously doubt that evidence of the rape perpetrated by his codefendant added much in terms of "aggravating" the jurors. In other words, evidence of the rape was not the straw that broke the camel's back. Third, at the close of evidence the court properly instructed jurors that they could consider evidence about other crimes only for a limited purpose and not to prove the character of the defendants. "A presumption always exists that the jury has followed the instructions given to it by the trial court." *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, at paragraph four of the syllabus. Thus, we conclude that the error was harmless and overrule this assignment of error.

### IV. Hearsay Testimony

{¶44} In his second assignment of error, Dixon contends that the trial court erred during a pretrial hearing when, during the testimony of William Mollett, a potential state witness, it ruled that his testimony concerning statements by Tracy Chaffins, deceased, were admissible at trial. Dixon contends that the court improperly ruled these statements would be admitted as "excited utterances."

{¶45} Dixon mistakenly argues that Mollett's pretrial testimony came as part of a "suppression motion." In fact, Mollett's testimony was presented as part of the State's pretrial efforts to introduce "other acts" evidence, i.e., the Kentucky robbery. Mollett's testimony had no relevance to Dixon's suppression motion, which involved statements Dixon made to police.

{¶46} At the pretrial hearing, when Mollett attempted to testify about what the deceased Chaffin told him, defense counsel objected. The State responded that

Mollett's testimony was merely a proffer of what Mollett might testify to at trial and the trial court allowed Mollet to continue. Ultimately, Mollett did not testify at trial, so Chaffins' hearsay statements were never introduced to the jury.

**{¶47}** Even if we were to consider Dixon's objection as a motion in limine, a ruling on it was not a final order when issued. *State v. Edwards*, 107 Ohio St.3d 169, 2005-Ohio-6180, 837 N.E.2d 752, at ¶17. This reflects the nature of a motion in limine, which is designed to test the admissibility of proffered evidence before trial and outside the presence of the jury. Accordingly, a trial court's ruling on a motion in limine is tentative, interlocutory, and precautionary and cannot serve as the basis for an assignment of error on appeal. See *State v. Baker*, 170 Ohio App. 3d 331, 2006-Ohio-7085, 867 N.E.2d 426, at ¶9. For such a ruling to be appealable, it must effectively manifest itself in evidence actually admitted at trial and defense counsel must record an objection. See *State v. Brown* (1988), 38 Ohio St.3d 305, 311-312, 528 N.E.2d 523. That never happened because Mollett did not testify at trial and Chaffin's statements were never introduced.

**{¶48}** Accordingly, this assignment of error is meritless.

## V. Allied Offenses

**{¶49}** In his final assignment of error, Dixon argues that the trial court erred by imposing consecutive sentences for attempted murder, felonious assault, and aggravated robbery. Dixon contends that all three offenses are allied offenses of similar import under Ohio's multiple count statute, R.C. 2941.25. Dixon further contends that all three offenses share a single animus. Therefore, Dixon argues that the trial court erred by not merging his convictions. The State contends that felonious assault and

aggravated robbery are not allied offenses of similar import and thus the trial court did

not have to merge those offenses. The State concedes that attempted murder and

felonious assault are allied offenses of similar import but argues that the evidence

demonstrated a separate animus for each charge.

{¶50} Ohio's multiple-count statute, R.C. 2941.25, provides:

(A)     Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B)     Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶51} A two-step analysis is required to determine whether two crimes

are allied offenses of similar import. See, e.g., *State v. Blankenship* (1988), 38

Ohio St.3d 116, 117, 526 N.E.2d 816. Recently, in *State v. Cabrales,* 118 Ohio

St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, the Court stated: "In determining

whether offenses are allied offenses of similar import under R.C. 2941.25(A),

courts are required to compare the elements of offenses in the abstract without

considering the evidence in the case, but are not required to find an exact

alignment of the elements. Instead, if, in comparing the elements of the offenses

in the abstract, the offenses are so similar that the commission of one offense will

necessarily result in commission of the other, then the offenses are allied

offenses of similar import." Id. at paragraph one of the syllabus. If the offenses

are allied, the court proceeds to the second step and considers whether the

offenses were committed separately or with a separate animus. Id. at ¶31.

{¶52} First, we compare aggravated robbery and felonious assault in the abstract. In order to commit the offense of aggravated robbery, R.C. 2911.01(A)(1), one must, while attempting or committing a theft offense, have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it. To commit the offense of felonious assault, R.C. 2903.11(A)(2)/(D)(1), one must cause serious physical harm to another. Clearly, when compared in the abstract, these crimes are not allied offenses of similar import. One could commit aggravated robbery without causing serious physical harm to another. And one could commit felonious assault without committing a theft offense or without having a deadly weapon. Thus, these offenses are not "so similar that the commission of one offense will necessarily result in commission of the other." *Cabrales* at ¶26. See, also, *State v. Preston* (1986), 23 Ohio St.3d 64, 491 N.E.2d 685; *State v. Wilson*, Cuyahoga App. No. 91971, 2010-Ohio-1196, at ¶97; *State v. Smith*, Montgomery App. No. 08CA0060, 2009-Ohio-5048, at ¶20; *State v. Walker* (June 30, 2000), Montgomery App. No. 17678, 2001 WL 873222; *State v. Sherman* (May 7, 2001), Clermont App. No. CA99-11-106, 2001 WL 473795.

{¶53} Next, we compare, the crimes of attempted murder and aggravated robbery in the abstract. As stated above, to commit aggravated robbery, one must while attempting or committing a theft offense, have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it. In order to commit the

offense of attempted murder as defined in R.C. 2903.02(A), one must engage in conduct that, if successful, would result in purposely causing the death of another. Again, clearly, these are not allied offenses. One could commit aggravated robbery without purposely causing the death of another. *State v. Lockhart*, Cuyahoga App. No. 74113, 1999 WL 728354. See, also, *State v. Fortson*, Cuyahoga App. No. 83895, 2004-Ohio-5220, at ¶9. And one could commit attempted murder without committing a theft offense. Thus, merger was not required for the aggravated robbery conviction.

{¶54} We next consider whether the felonious assault charge is an allied offense of attempted murder. The State candidly directs our attention to a recent Supreme Court case on point. In *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, the Court held that felonious assault as defined in R.C. 2903.11(A)(2) is an allied offense of attempted murder as defined in R.C. 2903.02(A) and 2923.02. In the absence of a separate animus for each crime, a criminal defendant "may be found guilty of both offenses, [but] he may be sentenced for only one." Id. at ¶27. Because of the holding in *Williams*, we need not determine whether the elements align to such an extent as to result in the offense being allied offenses. But we must still determine if the offenses were committed with a separate animus.

{¶55} The Supreme Court explained the meaning of the word "animus" in *State v. Logan* (1979), 60 Ohio St.2d 126, 397 N.E.2d 1345. "R.C. 2941.25(B), by its use of the term 'animus', requires us to examine the defendant's mental state in determining whether two or more offenses may be chiseled from the same criminal conduct. In this sense, we believe that the General Assembly intended the term 'animus' to mean

purpose or, more properly, immediate motive." Id. at 131.  In more detail, the court

further explained:

> Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime. For example, when a person commits the crime of robbery, he must, by the very nature of the crime, restrain the victim for a sufficient amount of time to complete the robbery. Under our statutes, he simultaneously commits the offense of kidnapping (R.C. 2905.01(A)(2) [sic] by forcibly restraining the victim to facilitate the commission of a felony. In that instance, without more, there exists a single animus, and R.C. 2941.25 prohibits convictions for both offenses. Likewise, where an individual's immediate motive is to engage in sexual intercourse, and a so-called "standstill" rape is committed, the perpetrator may be convicted of either rape or kidnapping, but not both. In contradistinction, an individual who restrains his intended rape victim for several days prior to perpetrating the rape, or who transports her out of the state or across the state while intermittently raping her, may well be considered to have a separate animus as to each of the offenses of kidnapping and rape, and convictions on multiple counts could reasonably be sustained.

Id. at 131-132.

**{¶56}**  Dixon contends that the evidence supporting his conviction for felonious

assault and attempted murder all occurred from one singular incident causing harm to

Waddell.  The State argues that evidence at trial indicated that Waddell was struck from

behind with a hammer as he was walking up the aisle towards Dixon.  The State further

contends that photographs demonstrate that the initial blow knocked him to the ground,

but he was able to get up and may have grabbed a grocery cart, leaving a bloody

handprint.  The State suggests that the evidence also indicates that Waddell fought with

his attackers and received defensive bruises to his hands and arms.  Ultimately,

Waddell received five blows to the head and twelve blows to the arm.  The State argues

that the initial blow, knocking Waddell out, was sufficient for purposes of providing an

animus or motive for the felonious assault. But the additional blows that came afterward show evidence of a separate motive for attempted murder.

**{¶57}** Recently, the Eighth District Court of Appeals addressed a similar situation in *State v. Carter*, Cuyahoga App. No. 90504, 2009-Ohio-5961. The court first noted that "[t]he fact that there were several wounds does not automatically mean that a separate animus attaches to each injury." Id. at ¶9. The court explained:

> [I]n determining whether a separate animus exists, courts have examined case-specific factors such as whether the defendant at some point broke "a temporal continuum started by his initial act" [citing *State v. Williams,* Cuyahoga App. No. 89726, 2008-Ohio-5286]; whether, at some point, the defendant created a "substantial independent risk of harm" [id.]; whether facts appear in the record that "distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed" [citing *State v. Hines,* Cuyahoga App. No. 90125, 2008-Ohio-4236]; and whether a "significant amount of time passed between the beginning of the felonious assault and the end of the attack [citing *State v. Chaney,* Stark App. No. 2007CA00332, 2008-Ohio-5559]."

Id.

**{¶58}** We find *Carter* instructive. In this case the evidence at best demonstrates that Waddell was struck with an initial blow sufficient to cause total memory loss of what occurred next. The jury could speculate from the additional blows to Waddell's head and blows to his arms that Waddell may have attempted to fight his attackers or attempted to shield himself from their blows with his arms. Furthermore, the evidence suggested that Waddell may have been dragged from the initial point of attack to a different location in the store.

**{¶59}** But none of this evidence indicates two distinct motives in the assault, i.e., that during the course of the robbery, Murphy and Dixon first decided to seriously injure Waddell and then later decided to kill him, or vice versa. Moreover, no evidence

suggests that the attack took place over an extended period of time, which might permit such an assumption. Neither does the evidence reasonably support the conclusion that there was a temporal break in the attack. There is simply no way that reasonable jurors could differentiate one of the approximate seventeen "blows" that Waddell received as a result of the robbery.

**{¶60}** At best, the evidence suggests a violent continuous attack with a single motive: to cause serious injury or death to Waddell in order to allow Dixon and Murphy to commit a robbery. Thus, the trial court erred in failing to merge Dixon's sentences for felonious assault and attempted murder.

## VI. Conclusion

**{¶61}** Based on the foregoing, we overrule Dixon's first and second assignments of error. We partially sustain Dixon's third assignment of error concerning the trial court's failure to merge his convictions for felonious assault and attempted murder. Pursuant to the Supreme Court's holding in *State v. Whitfield,* 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, at paragraph one of the syllabus, "[t]he state retains the right to elect which allied offense to pursue on sentencing on a remand to the trial court after appeal."

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART, AND
CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED.  Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

McFarland, P.J. & Kline, J.:  Concur in Judgment and Opinion.

For the Court

BY: _____
        William H. Harsha, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**