[Cite as *Wallace v. S. Ohio Med. Ctr.*, 2011-Ohio-3570.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

HEATHER ANN WALLACE,                    :
 fka HEATHER ANN MILLER,                :
 As Administrator of the Estate of      :
 Dartanian Michael Wallace,             :
 deceased                               :
                                        :
        Plaintiff-Appellant,            :       Case No. 10CA3383
                                        :
        vs.                             :
                                        :
SOUTHERN OHIO MEDICAL                   :
CENTER, et al.,                         :       DECISION AND JUDGMENT ENTRY
                                        :
        Defendants-Appellees.           :       **RELEASED 07/07/11**
_____
                              APPEARANCES:

Roger L. Clark, Portsmouth, Ohio, for Appellant.

Stephanie P. Franckewitz, Milford, Ohio, and James P. Triona, Cincinnati, Ohio, for Appellees.
_____
Harsha, P.J.

        **{1}**   Heather Ann Wallace appeals from a summary judgment entered in favor of Steven W. Crawford, M.D., on the medical malpractice complaint she filed following the stillbirth of her son.  She argues that when ruling on Crawford's summary judgment motion, the trial court improperly weighed the credibility of her own expert's opinion.  However, most of plaintiff's expert testimony was critical of Dr. Crawford's treatment of the umbilical cord prolapse, a condition that did not cause the infant's death.  And more importantly, Plaintiff's expert failed to identify any conduct by Dr. Crawford that deviated from the standard of care for treating the ruptured placenta, the event that all the experts agreed caused the tragedy.  Therefore, the trial court did not err when it concluded the Plaintiff's expert's opinion failed to create a genuine issue of material

fact.  And in the absence of some evidence that Crawford breached his duty, Crawford was entitled to summary judgment.

{2}     Wallace also asserts that the trial court improperly granted Crawford's motion in limine.  Because a trial court's ruling on a motion in limine is not a final appealable order, we decline to address this argument.  Accordingly, we overrule Wallace's first assignment of error and affirm the trial court's judgment.

## I.  OVERVIEW

{3}     Few things in life can evoke one's emotions like the loss of a child during birth.  No one can deny that Wallace has suffered an indescribable loss.  However, we cannot review a medical malpractice action based upon the emotions it evokes or the enormity of the tragedy.  Instead, we must decide this case by applying well-established legal standards.  Doing so  leads to the conclusion that, tragic though this case may be, Wallace did not establish a viable medical malpractice action against Crawford.

## II.  FACTS

{4}     The basic facts are undisputed.  Wallace came to Southern Ohio Medical Center believing that she was in labor.  She subsequently was admitted and was placed on a fetal monitoring device. Between 1539 and 1551 hours, the fetal monitoring strip showed some fetal heart rate decelerations.  The strip then returned to normal, where it remained until approximately 1702 hours, at which point the strip showed a prolonged variable deceleration.  The fetal monitoring strip then returned to a reassuring pattern. At 1732 hours, an ultrasound detected that the umbilical cord was around the baby's "nuchal or neck area, and that there was a loop of cord down along the side of the baby's face."  At 1735, a vaginal examination revealed a cord prolapse, which is a displacement or slipping of the umbilical cord from its usual position.  This often results

in a kink in the cord. At 1755, the baby was delivered by caesarean section. The baby was pale and lifeless as a result of a catastrophic placental abruption (sudden rupture) that had occurred within minutes of the delivery. Despite resuscitative efforts, the baby did not survive. Wallace subsequently instituted this medical malpractice action against Crawford and other defendants who are not parties to this appeal.

### III. EVIDENCE

### A. WALLACE'S MEDICAL EXPERT

{5} At his initial deposition, Wallace's expert, William Harrison Moore, Jr., was clearly unprepared. Moore stated that he had "not had a chance to review the records recently" and that he testified based upon a written summary prepared in May of 2002. The record is not clear about precisely who prepared this summary, which is attached to his deposition and states that it is a "memorandum" prepared "to" the "Heather Miller File," and that it is "from" "Nancy L. Dorner," one of Wallace's former attorneys. The "subject" line reads: "Report from Dr. William Moore as read by Carol Volberg." Moore went on to explain that he had misplaced his records, "[b]ut I've looked at the hospital records, as I best recall, that were presented to me, I believe clinic records from the patient. And I believe I've seen some of the depositions, possibly not all of them, but it's been quite some time since I've reviewed them." However, as Crawford points out in his brief, Moore could not even remember a simple fact such as Crawford's name.

{6} Despite what appeared to be Moore's lack of knowledge of the case, the parties proceeded with the initial deposition. During this examination Moore opined that Crawford deviated from the standard of care because, "looking at some of the heart rate decelerations with the patient and going up to the end, I just don't feel the patient was managed appropriately." He explained:

"[A]fter [Wallace] began to have decelerations, and she had some—what I considered some variable decelerations, some late decelerations. And in looking at my notes here, that seems to be around 15:39 to 15:51 hours on the day that she was in labor.
At some point in time after those heart rate decelerations, he should have been given some sort of heads-up information as to what was going on and had an opportunity to hopefully give some input as to how the patient was being managed."

{7}     Moore noted "there appeared to be some question as to a cord prolapse." However, he concluded that the baby's cause of death resulted from "some type of catastrophic placental abruption occurred, a detachment of the afterbirth tissue from the uterine wall. And when that happens, that's usually a terminal event. You only have a matter of seconds, if any time, to get the baby out." He opined that the abruption occurred "very shortly before the baby was delivered, within probably minutes around the time of—of when it occurred."

{8}     Moore believed that the health care professionals could have intervened sooner by "rupturing [Wallace's] membranes and doing internal scalp monitoring." He stated that the internal scalp monitoring could provide more accurate information regarding the baby's heart rate and that the membrane rupturing would allow the healthcare professionals "to assess the color of the amniotic fluid, which sometimes that can also give you some indications as to what may or may not be going on with the baby." Moore believed that it is more likely than not that this earlier intervention would have led to an earlier delivery time. However, he offered no opinion about whether the earlier delivery would have resulted in a successful birth.

{9}     Later in the deposition Moore stated that he believed that a final large heart rate deceleration occurred around 1700 hours, indicating that the cord prolapse and/or abruption had started. This was in direct conflict with his earlier testimony that

the abruption occurred "very shortly before the baby was delivered".   He also stated that the fetal monitor strip did not show any heart rate above 160, which makes it less likely that an abruption had occurred that far in advance of the c-section delivery.

{10}    Moore went on to testify that once a fetal distress is recognized, the standard of care requires delivery within 30 minutes of the distress diagnosis.  He agreed that if the cord prolapse was diagnosed at 17:35 and the surgery occurred around 17:45, then Crawford met the standard of care.  However, in response to a question concerning the time of the diagnosis of the cord prolapse, he responded: "Based on my notes, I had voiced concern that around 17:00 hours that there was a significant fetal heart rate deceleration, and then it was some fifty, fifty-five minutes before the baby was delivered.  And that's what I was calling my point which I felt the baby needed to be urgently delivered."

{11}    Moore gave a second deposition after he had reviewed his records, including Wallace's labor and delivery records, the fetal monitoring strips, Crawford's deposition, and "one of the nurse midwives' depositions."  He stated that he had reviewed his prior deposition and that he would not change anything he had stated in that deposition.

{12}    Moore explained that a normal fetal heart rate is reassuring, if that is the only factor under consideration.  He stated that around 1701 hours, the fetal "heart rate went down into the 90s and 60s for several minutes" and then returned to normal.  The fetal monitoring strip showed an earlier variable deceleration at 1540 hours, which again had returned to normal until the second one occurred around 1701 hours.

{13}    Moore opined that "the healthcare team" deviated from the standard of care in the following respect:

"[T]he healthcare team that was caring for the patient—from the time that the cord prolapse was documented, that is a medical emergency. And once that occurs and someone says, We have a cord prolapse, and that isn't brought into question and say, Yep, it's definitely a cord prolapse, then you've roughly got about thirty minutes to deliver that person. That doesn't matter whether the cord prolapsed or some other life-threatening event to the baby. (sic)
And I believe in my review of the records that a great deal of time more than thirty minutes lapsed from the time that the cord prolapse was noted to the time that the baby was delivered. And that's my biggest concern with this case, is the time it took to deliver the baby from the time that the cord prolapse occurred."

{14} Moore agreed that "[u]p until the time of the cord prolapse," there were no other deviations from the standard of care. He stated: "I'm not saying that people deviated other than in that cord prolapse."

{15} Moore apparently felt from his review of the records that the cord prolapse occurred around 1700 hours, notwithstanding the fact that it was not formally diagnosed until 1735. Thus, he stated his biggest criticism was "the time it took to deliver the baby from the time the cord prolapse occurred." In response to another question concerning the time of the prolapse, Moore reiterated his opinion that "Approximately around 1700 hours is when the cord prolapse occurred." However, Moore also agreed with defense counsel that the child died from a massive abruption of the placenta, which occurred shortly before delivery. Yet he did not connect the occurrence of the abruption in any manner to the cord prolapse.

## B. DEFENSE WITNESSES

### 1. Crawford

{16} Crawford testified that at 1702 hours, he received a page and was advised that the baby had a variable deceleration around 1702 hours. He instructed the nurse to continue to observe, as the tracing had become reassuring after the deceleration. He

further observed that around 1540 hours, there was an earlier variable deceleration, which "could mean that the baby moved in a certain position, compressed the cord, which happens on most labor and delivery processes, so I look for a return of fetal heart rate to a reassuring tracing thereafter." Crawford was notified of the cord prolapse at 1735 hours, which then required an emergency c-section. He stated that the surgery began at 1755. When he arrived in the room before surgery, the baby had a reassuring heart rate and Wallace was in a hands-and-knees position to keep the cord off the baby's head. Crawford stated that upon delivery, the baby was pale. He opined that the baby died from a complete placental abruption, which likely occurred around the time that Wallace was moved into a surgical position from the hands-and-knees position.

### 2. Frank Manning Affidavit

{17}   Crawford's expert, Frank Manning, unequivocally states in his affidavit that the placental abruption was "unforeseeable and not causally related to the diagnosis of the cord prolapse." Manning stated: "The total placental abruption was an independent cause of death and not proximately related to the timing or method of delivery of [the baby] or the management of the labor of [Wallace]." He further stated that the cord prolapse diagnosis "did not foretell the eventual massive and catastrophic total placental abruption, the life-ending event in this case. The management of the cord prolapse did not proximately cause the total placental abruption." Manning further opined that Crawford met the standard of care by delivering the baby within 30 minutes of the cord prolapse diagnosis.

### IV.  SUMMARY JUDGMENT PROCEEDINGS

{18}   In his summary judgment motion, Crawford asserted that the undisputed evidence shows that the cord prolapse was diagnosed at 1735 and that the c-section was performed at 1755.  Crawford noted that Moore, Wallace's own expert, admitted that the standard of care is met when addressing a cord prolapse if the delivery occurs within 30 minutes of the cord prolapse diagnosis.  Crawford argued that Wallace therefore has no evidence to raise any genuine issue of material fact as to whether Crawford breached the standard of care.

{19}   Crawford additionally contended that Wallace presented no evidence to show a genuine issue of material fact remains regarding proximate cause.  He observed that all medical experts agreed that the cause of death was a catastrophic placental abruption.  Crawford asserted that Wallace failed to offer any evidence that any delay in delivery or any alleged negligent care proximately caused the placental abruption.  Crawford pointed out that his expert unequivocally stated in his affidavit that the placental abruption was "unforeseeable and not causally related to the diagnosis of the cord prolapse."

{20}   In response, Wallace asserted that her expert opined that the delivery should have occurred within 30 minutes of the final deceleration, which occurred at 1700.  She therefore argued that the c-section window began at 1700, not 1735, when the cord prolapse was diagnosed.  She points to the following testimony from Moore's original deposition:  "Based on my notes, I had voiced concern around 17:00 hours that there was a significant fetal heart rate deceleration, and then it was some fifty- fifty-five minutes before the baby was delivered.  And that's what I was calling my point which I felt the baby needed to be urgently delivered."  According to Wallace, Moore stated:  (1) "It was more probable than not, i.e., to a reasonable degree of medical probability, the

placental abruption was ongoing at 17:00; (2) that the major fetal heart rate deceleration at 17:00 was a telltale sign which is an indication that something wrong is going on; (3) that he viewed this deceleration as the point where he felt the baby needed to be urgently delivered; and (4) that the delivery did not occur until 17:55, a breach of the standard of care."

{21}   The trial court entered summary judgment in Crawford's favor, concluding that Moore's deposition testimony failed to establish a genuine issue of material fact about whether Crawford deviated from the standard of care.  The court observed that Moore testified that upon diagnosis of a cord prolapse, the standard of care requires an emergency c-section to be performed within 30 minutes of that diagnosis.  The court found that the record contains no dispute that the cord prolapse diagnosis occurred at 1735 hours and further contains no dispute that the c-section was performed at 1755 hours.  The court thus concluded that Moore's testimony establishes that Crawford met the standard of care by performing the c-section within the 30 minute standard of care window.

## V.  ASSIGNMENTS OF ERROR

{22}   Wallace raises two assignments of error:

First Assignment of Error:

"The trial court erred in granting summary judgment to Defendant/Appellee because there were genuine issues of material fact."

Second Assignment of Error:

"The trial court erred in granting the motion in limine of Defendant to exclude any evidence of Defendant's drug use."

## VI.  SUMMARY JUDGMENT

**{23}**   In her first assignment of error, Wallace asserts that the trial court erred by granting summary judgment to Crawford.  In particular, she claims that the court improperly weighed Moore's credibility by focusing primarily on his second deposition, which she contends partially contradicts his first one.  She asserts that Moore's inconsistent testimony creates a genuine issue of material fact about whether Crawford met the standard of care.  Wallace asserts that according to Moore, the 30 minute standard-of-care window began at 1700, when the final deceleration occurred, not at 1735, when the cord prolapse diagnosis occurred.

## A.  SUMMARY JUDGMENT STANDARD

**{24}**   In reviewing a summary judgment, we review the judgment independently and without deference to the trial court's determination.  See, e.g., *DIRECTV, Inc. v. Levin*, 128 Ohio St.3d 68, 2010-Ohio-6279, 941 N.E.2d 1187, at ¶15, citing *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, at ¶8 (stating that appellate review of summary judgment is de novo).  "'Summary judgment is appropriate [only] if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.'"  *DIRECTV* at ¶15, quoting *State ex rel. Duncan v. Mentor City Council,* 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶9; see, also, Civ.R. 56(C).  The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue exists as to any material fact.  See, e.g., *Todd Dev. Co., Inc. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶12; *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264.  If the moving

party satisfies this burden, then the nonmoving party bears the reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.  See, e.g., *Todd Dev. Co.* at ¶12, citing *Dresher* and Civ.R. 56(E).  "If a moving party meets the standard for summary judgment required by Civ.R. 56, and a nonmoving party fails to respond with evidence of a genuine issue of material fact, a court does not err in granting summary judgment in favor of the moving party."  *Todd Dev. Co.* at ¶14.

**{25}**    Not every factual dispute precludes summary judgment.  Rather, only disputes as to the *material* facts preclude summary judgment.  See *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (stating that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  "As to materiality, the substantive law will identify which facts are material."  Id.; *Hoyt, Inc. v. Gordon & Assoc., Inc.* (1995), 104 Ohio App.3d 598, 603, 662 N.E.2d 1088.

**{26}**    Here, even if a factual dispute remains, it is not a dispute of a material fact, i.e., a factual dispute that might affect the outcome of Wallace's medical malpractice claim.

### B.  MEDICAL MALPRACTICE ELEMENTS

**{27}**    A successful medical malpractice action requires a plaintiff to present expert testimony that establishes each of the following elements by a preponderance of the evidence:  (1) the applicable standard of care; (2) a breach of that standard of care; and (3) that the breach was a proximate cause of the injuries alleged.  See, e.g., *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 346 N.E.2d 673, paragraph one of the syllabus ("In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing

or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."). Failure on any one of these elements renders summary judgment appropriate. See *Jewett v. Our Lady of Mercy Hosp. of Mariemont* (1992), 82 Ohio App.3d 428, 432, 612 N.E.2d 724.

## C. MOORE'S OPINION TESTIMONY DOES NOT CREATE A GENUINE ISSUE OF MATERIAL FACT

{28}    We start with the material facts that are not disputed: (1) Wallace suffered an injury; (2) the injury resulted from a massive placental abruption; and (3) there is no evidence that the cord prolapse caused the baby's death. All the experts agree that the cause of the baby's death was the placental abruption. Thus, in order to proceed on her medical malpractice complaint, Wallace's evidence needs to show that material factual issues remain regarding whether Crawford breached the standard of care in treating the placental abruption. Alternatively, Wallace would need to show that a breach in the standard of care relating to the cord prolapse proximately caused the placental abruption. Because the evidence shows neither of these things, the trial court appropriately entered summary judgment in Crawford's favor.

{29}    Moore does not offer any testimony establishing the applicable standard of care when facing a placental abruption. Nor is there any testimony that Crawford breached the standard of care relating to the placental abruption. In fact, Moore readily admits that his only criticism concerns the cord prolapse diagnosis and treatment.

Because Moore never offered any testimony that Crawford breached the standard of care relating to the placental abruption, Wallace cannot establish the first element necessary to succeed on her medical malpractice complaint.

**{30}** Wallace's assertion that Moore's inconsistent deposition testimony regarding the cord prolapse creates a genuine issue of material fact is meritless. Whether Crawford breached the standard of care relating to the cord prolapse would be a material fact if the cord prolapse had caused the baby's death. There is no evidence that the cord prolapse caused the placental abruption. Moore never states that Crawford's treatment of the cord prolapse contributed to the placental abruption. In the absence of such testimony, Wallace cannot demonstrate a genuine issue of a material fact about whether Crawford's treatment of the condition that caused the baby's death fell below the standard of care. Moore's opinion about the treatment of the cord prolapse is largely irrelevant.

**{31}** Consequently, Wallace's assertion that the trial court improperly weighed the credibility of her expert's testimony is meritless. The court did not weigh credibility; rather, it looked to see whether Moore's testimony created a dispute as to a *material* fact. Determining that it did not, the court properly entered summary judgment in Crawford's favor.

**{32}** Accordingly, we overrule Wallace's first assignment of error.

## VII.  MOTION IN LIMINE

**{33}** In her second assignment of error, appellant argues that the trial court should not have granted appellees' motion in limine.

**{34}** "[A] trial court's ruling on a motion in limine is tentative, interlocutory, and precautionary and cannot serve as the basis for an assignment of error on appeal."

*State v. Dixon*, Scioto App. No. 09CA3312, 2010-Ohio-5032, ¶47.  Thus, a ruling on a

motion in limine is not a final appealable order.  See *State v. Edwards,* 107 Ohio St.3d

169, 2005-Ohio-6180, 837 N.E.2d 752, ¶17; see, also, *Huffman v. Hair Surgeon, Inc.*

(1985), 19 Ohio St.3d 83, 86 fn.5, 482 N.E.2d 1248.

    **{35}**    Accordingly, we decline to address Wallace's second assignment of error.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Abele, J. & Kline, J.:  Concur in Judgment and Opinion.


For the Court


BY: _____
       William H. Harsha, Presiding Judge


**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**